(C. D. 1171)

S. Nathan & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided May 10, 1949)

*John D. Rode* for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before Oliver, Cole, and Mollison, Judges

Oliver, Chief Judge: The merchandise involved in this suit is described on the invoice as "synthetic rubies" and "synthetic white

sapphires." It was assessed with duty at the rate of 20 per centum ad valorem under paragraph 1528, Tariff Act of 1930, as "imitation precious stones," and is claimed properly dutiable at 10 per centum ad valorem under the provision of the same paragraph as "precious stones," either directly or by virtue of the similitude clause of paragraph 1559.

The pertinent provisions of the involved paragraphs of the tariff act read as follows:

PAR. 1528. * * *; diamonds, coral, rubies, cameos, and other precious stones and semiprecious stones, cut but not set, and suitable for use in the manufacture of jewelry, 10 per centum ad valorem; imitation precious stones, cut or faceted, * * *, 20 per centum ad valorem.

PAR. 1559. That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *.

Two witnesses testified on behalf of the plaintiff. There were also received in evidence six stones representing samples of synthetic sapphires and rubies (plaintiff's collective exhibit 1 (R. 18)). No testimony was introduced by the Government in support of the collector's classification.

Plaintiff's witness Nathan, the president of the plaintiff company, testified that for 27 years he had dealt in imported precious and semiprecious stones. He had also handled imitation precious and semiprecious stones and had also bought and sold in substantial quantities domestic and imported synthetic stones (R. 7). In his opinion, natural rubies and natural sapphires are identical in color, cleanliness, hardness, luster, and transparency, the qualities found in natural stones, with the synthetic stones as represented by plaintiff's collective exhibit 1 (R. 11, 12, 14). As regards the use of both synthetic and natural rubies and sapphires, the witness stated they were both suitable for use in the manufacture of jewelry and were so used in substantial quantities (R. 16). The witness was of the opinion that the synthetic stones herein are not imitation rubies or sapphires, which he stated are made of glass or at times of a plastic material. He stated that synthetic stones were never sold as imitation stones but "We sell them as just what they are." He further testified that the term "precious stone" applies to genuine stones only and that he did not classify synthetic stones as genuine stones and stated that by "genuine" he meant "natural" (R. 23).

Plaintiff's second witness, a mineralogist by profession, was director of a laboratory where jewelers have stones identified as to whether they are synthetic or precious. He also had dealt in various kinds of precious, semiprecious, and synthetic stones. He stated that he had

made extensive research in connection with synthetic rubies and sapphires and had written articles on the subject. He had, however, never observed the process whereby synthetic stones were made (R. 27). He stated that synthetic rubies and sapphires can be made identical in color with natural rubies and sapphires; that the degree of cleanliness is apt to be better for synthetic stones; that they are identical in hardness, luster, transparency, and specific gravity with natural rubies and sapphires; and that in chemical composition, both types of stones are substantially identical. He stated that despite the similarity in so many respects it is possible to distinguish between a synthetic ruby and sapphire and the natural stones either optically or by means of X-ray (R. 29).

The witness described the method of producing synthetic rubies and synthetic sapphires (which is also set out in plaintiff's illustrative exhibit 3). The process starts with a chemical compound known as alum or ammonia alum which is calcined in a combustion bottle or vessel at a temperature of 1,800 degrees Fahrenheit for about 2 hours, at the end of which time the original material has expanded and completely changed form. As the crystallization of the alum is given off, there remains a spongy mass of alumina known as "gamma alumina" that is used to manufacture the synthetic ruby or synthetic sapphire (R. 32). The witness then detailed the steps in the process which result in the formation of a mass or "boule." An approximate temperature of 4,500 degrees Fahrenheit is maintained throughout the length of time it takes to produce the boule. A sample of a ruby boule was received in evidence (plaintiff's illustrative exhibit 4). The witness further testified that in order to facilitate the cutting of the material, the "boule," which is in a state of strain, is then lightly tapped on the end and breaks into two pieces, thus relieving the major strain, and that the final product of such manufacturing process would be a synthetic stone which is thereafter cut and faceted. He then stated that gamma alumina, the material used in the manufacture of synthetic stones, is not a mineral but is a chemical substance and that the "optical and physical properties of gamma alumina are distinct from some of the others" (R. 40); that when this gamma alumina hits the 4,500-degree Fahrenheit flame, it is instantly made molten and then becomes alpha-alumina (R. 42), so that after the synthetic stone has been manufactured and becomes the finished product, both the synthetic stone and the natural stone are chemically identical, namely, alpha-alumina, and that, aside from the fact that one stone is man-made and the other made by nature, there is no substantial difference between the synthetic and natural stones (R. 43).

The Government, while agreeing that chemically the composition of the synthetic stones before us is identical with those found in nature and that they can be distinguished from the natural stones only by

experts, maintains that the history of the precious-stone paragraph (paragraph 1528) shows that the Congress has always considered only those stones as precious as are found in nature and are rare in existence. It further maintains that the Congress, in providing for precious stones, *cut*, meant that such stones should have had an existence as precious stones before being cut to bring them within that term.

The Congress had before it at the time the Tariff Act of 1922 was being formulated, the Tariff Information Surveys, compiled by the United States Tariff Commission on the Tariff Act of 1913. The following excerpts from Vol. 5, Schedule N, relative to predecessor paragraph 357 of the Tariff Act of 1913, indicate that the Congress had before it information as to what was considered "precious stones" and what was "imitation stones." At page 32, under the heading "PRECIOUS STONES AND PEARLS, NOT ADVANCED IN VALUE FROM THE ORIGINAL STATE" it is stated:

SUMMARY

Precious stones are crystals of various rare minerals.  * * *

And at page 37:

SUBSTITUTES

In general, it may be said that semiprecious stones are used as imitations of precious stones. Cheap imitations of every known precious stone are made of glass. The ruby and sapphire are the only stones that have been produced artificially of a size suitable for gems. Artificial rubies and sapphires of large size and fine color have been produced, which can be distinguished from natural stones only with extreme difficulty. *Mined* rubies of good color are worth up to $1,000 per carat but synthetic stones may be bought for $10 to $20 per carat. [Italics ours.]

At page 51:

SUMMARY

*Description and uses.*—Cut precious stones are crystals of various minerals which have been shaped or cut, and polished, to enhance their color and brilliancy.  * * *

At page 64, under the heading "IMITATION PRECIOUS STONES" is found:

Par. 357. Imitation precious stones, including pearls and parts thereof, * * *, doublets, artificial or so-called synthetic or reconstructed pearls * * * or other precious stones, 20 per cent ad valorem.

DESCRIPTION AND USES

Imitation precious stones are usually glass replicas of the more valuable precious stones. * * *

Synthetic or "reconstructed" stones differ from the imitation article in that they are of the same composition as the true gem and are frequently produced by melting powder from the gem mineral in an oxyhydrogen flame. Some specimens of synthetic rubies and sapphires resemble the *mined* gem so closely that experienced gem experts have great difficulty in distinguishing one from the other.  * * * [Italics supplied.]

At page 65:

RAW MATERIALS

* * * In the manufacture of synthetic sapphires and rubies chemically pure aluminum oxide is used together with a small amount of metal salt for a coloring agent. Dust and chips from cutting natural gems may also be employed.

EQUIPMENT

* * * Hand work predominates but automatic machinery is used for some varieties of imitation stones. The manufacture of synthetic gems requires a delicate apparatus surrounding an oxyhydrogen blow pipe.

METHODS OF MANUFACTURE

Glass imitations of precious stones are pressed in molds of the size and shape required in the finished stone. * * *

*     *     *     *     *     *     *

Synthetic gems are produced by dropping fine aluminum oxide powder through an oxyhydrogen flame. * * * The artificial crystal (called a "boule") is cut in the same manner as the mined stones.

As to the common meaning of "precious" we find the following. Webster's New International Dictionary, Second Edition, Unabridged, 1948 Edition:

precious * * * Of great price or value; costly; as, a *precious* stone. * * * *Gems.* A. Of highest value commercially, because of beauty, rarity, and esp. hardness; chiefly in phrase precious stone. Diamonds, rubies, sapphires, and emeralds are always ranked as precious stones; * * *.

Funk & Wagnalls New Standard Dictionary, 1942 Edition:

precious * * * Highly priced or prized, as for rarity, or for intrinsic, exchangeable, or other value * * *.

In "5,000 Years of Gems and Jewelry," by Rogers and Beard (J. B. Lippincott Company, Philadelphia, New York, New, Revised Edition, 1947), Chapter XI, p. 167, the following is stated:

* * * a true gemstone is first of all a mineral which nature *unassisted by the chemist* has formed. Even though the chemist may use the same materials as nature did, and produce in his laboratory a synthetic stone which so closely resembles a natural crystal that only the expert knows the difference, yet the artificial stone does not qualify as a true gemstone * * *.
[Italics quoted.]

To qualify as a gemstone, a stone should have the following characteristics:

1. Outstanding beauty.
2. Sufficient hardness to retain that beauty.
3. *Rarity.* [Italics supplied.]

Four stones possess these necessary qualities to such a high degree that they are in a class apart and are known as *noble or precious stones.* These royal members of the mineral family are: the diamond, the ruby, the emerald, and the sapphire. [Italics quoted.]

The plaintiff in its brief contends "that a genuine synthetic product is entitled to the same classification for customs purposes

as the same product of nature," citing *United States* v. *Schering*, 163 Fed. 246; *Pickhardt & Kuttroff* v. *United States*, 1 Treas. Dec. 641, T. D. 20925; and *Fritzsche Brothers* v. *United States*, 7 Treas. Dec. 49, T. D. 24905, all of which arose under the Tariff Act of 1897. The cases cited above are distinguishable from the case at bar. In the *Schering* case, *supra*, the question was whether synthetic camphor containing impurities was dutiable as refined camphor or was free of duty as crude camphor. The court there held that, measured by the principal tests, the merchandise still retained impurities that brought it far below the standard of refined camphor and that, resembling the crude natural product, it was subject to classification as "camphor, crude" rather than as "camphor, refined." In the *Pickhardt* case, *supra*, the merchandise was indigo derived synthetically from coal tar. There was no question there raised as to whether a synthetic product should be dutiable as an imitation indigo because there was no provision in the tariff act for imitation indigo. The case appears to have been determined upon the question of commercial designation, the court finding the involved product to be known in the commerce of the United States as "indigo." The *Fritzsche Brothers* case, *supra*, involving artificial oil of cassia, likewise was decided upon the question of commercial designation. There was no question presented whether the synthetic product there involved was dutiable as an imitation because there was no provision in the act for imitation oil of cassia. In the case before us, it has not been established that the commercial meaning of the terms "rubies" and other "precious stones" (paragraph 1528) includes within it synthetic rubies and sapphires. This record goes further and affirmatively establishes that synthetic stones are not bought and sold as precious stones but under their actual description as synthetic stones (R. 16). Furthermore, in a letter to the appraiser (exhibit 2), plaintiff's witness stated that synthetic stones are considered commercially as imitations of precious stones.

In view of the legislative history, lexicographic, and other authorities, and the terms of the tariff act itself which indicate the distinction between precious stones and synthetic stones, we are of opinion that the synthetic rubies and sapphires here in question are not dutiable directly as "precious stones."

Counsel for the plaintiff further contends that, from a study of the legislative history of paragraph 1528 and its predecessor paragraphs, Congress knew that synthetic stones by judicial decision had been classified as precious stones; that the Tariff Acts of 1909 and 1913 made special provision for synthetic stones and that in striking out this special classification in the Tariff Act of 1922, it was aware of the fact that such stones would once again pay duty at the same rate as precious stones; that, if not dutiable directly under paragraph 1528

as rubies and other precious and semiprecious stones, the imported synthetic stones are dutiable thereunder by similitude (paragraph 1559). It is maintained that under the doctrine of legislative adoption of judicial decisions the synthetic stones herein are properly dutiable as precious stones, as claimed.

Counsel for the plaintiff directs our attention to three cases which arose under the Tariff Act of 1897. In *Mermod & Jaccard Jewelry Company* v. *United States*, 6 Treas. Dec. 670, T. D. 24601, the court for the first time had before it an importation of artificial rubies made by combining oxide of chrome and aluminum. They were classified as nonenumerated manufactured articles and claimed dutiable as precious stones. The court therein stated:

> * * * The composition of this article and the *true* ruby are identical. They have the same degree of hardness, specific gravity, and color. The only way the *imitation* can be distinguished from the real is that the former under powerful lenses shows a number of concentric lines. [Italics ours.]

The articles therein were identical in material, texture, and use with genuine rubies. The court held that they were properly dutiable as precious stones (rubies) by similitude. This case was later reversed upon consent without opinion, however, in *United States* v. *Mermod & Jaccard Jewelry Company*, 10 Treas. Dec. 135, T. D. 26641. In *Albert Lorsch Co.* v. *United States*, 11 Treas. Dec. 527, T. D. 27278, the merchandise consisted of reconstructed rubies which were classified as nonenumerated manufactured articles and claimed to be dutiable as precious stones. The court found there was doubt as to whether the stones therein were produced synthetically or were chips or pieces of genuine rubies molded into compact form. In holding the merchandise to be dutiable by similitude to precious stones the court stated, in part:

> We find on the evidence * * * that the merchandise * * *, is either precious stones or articles not enumerated in the present tariff act, similar in material, quality, and the use to which it may be applied, to precious stones, which they more closely resemble in the particulars mentioned than any other articles enumerated in said act.

The case of *L. Heller & Sons* v. *United States*, 13 Treas. Dec. 901, T. D. 28295, also decided under the 1897 act, involved merchandise similar to that in the *Lorsch* case, *supra*. The court followed the *Lorsch* case and held the reconstructed rubies dutiable as precious stones by similitude. In the *Heller* case, *supra*, the protest also covered merchandise which consisted of two pieces of aquamarine or beryl, cemented together, green-coloring matter between the stones, giving to the completed article the appearance of an emerald. The court therein cited the case of *Erhardt* v. *Hahn*, 55 Fed. Rep. 273, wherein the United States Court of Appeals, Second Circuit, in affirming the decision of the lower court, said:

\* \* \* If it could be shown that these articles at the date of the tariff act were bought and sold as *precious stones* or were commercially known as such, then no doubt they would have to fall under that classification for duty. [Italics supplied.]

After pointing out that aquamarine and beryl are concededly precious stones, the court found the involved merchandise to be precious stones, so bought and sold, and known commercially as such, and held that the fact that they had been painted did not affect the result. In the present case, the stones before us were not bought and sold as precious stones nor were they commercially known as such. On this point, the witness Nathan testified that "synthetic is a distinct classification of stone." (R. 23.)

In the Tariff Information Surveys, 1921, on the Tariff Act of 1913, *supra*, under each of the general headings for "PRECIOUS STONES AND PEARLS NOT ADVANCED IN VALUE FROM THE ORIGINAL STATE," "PRECIOUS AND SEMIPRECIOUS STONES, ADVANCED," and "IMITATION PRECIOUS STONES," there appears a subheading titled "COURT AND TREASURY DECISIONS" (pages 51, 62, and 68, respectively). It is significant that the three cases cited, *supra*, by plaintiff are not mentioned in this survey. The reason for this omission is apparent inasmuch as the provision in the 1897 act for imitation precious stones was limited to those made of glass or paste. The merchandise involved in the above-cited cases, not being composed of glass or paste, could not have been classified as "imitation precious stones" and that question was not before the court. It is well-established that the rule of legislative ratification of judicial decision extends only to the precise points judicially determined. *Cunard Steamship Co. et al.* v. *United States*, 22 C. C. P. A. (Customs) 615, T. D. 47605. We do not find that, prior to the enactment of the Tariff Act of 1930 or the predecessor act of 1922, it had been judicially held that merchandise of the character here involved was not dutiable as "imitation precious stones" as those words are contemplated in the 1930 act. The cases cited, which arose under the 1897 act, are, therefore, not pertinent to the present issue and have no bearing in the application of the doctrine of legislative adoption of judicial decisions.

In the determination of the issue whether the involved stones are properly dutiable by similitude to "precious stones" or "imitation precious stones," recourse to the legislative history of paragraph 1528 indicates the following:

The predecessor paragraph 435 of the Tariff Act of 1897 provided for:

Diamonds and other precious stones advanced in condition or value from their natural state \* \* \*, and not set, ten per centum ad valorem; imitations of diamonds or other precious stones, composed of glass or paste, \* \* \*, and not mounted or set, twenty per centum ad valorem.

The Tariff Act of 1909 retained the 10 per centum rate on precious stones, cut, but provided for imitation precious stones in the following language:

449.  *  *  *  imitation precious stones, including pearls and parts thereof, for use in the manufacture of jewelry, doublets, artificial, or so-called synthetic or reconstructed pearls and parts thereof, rubies, or other precious stones, twenty per centum ad valorem.

It is to be noted that in the Tariff Act of 1909 for the first time there was a provision for synthetic stones.  This provision appeared in the same paragraph with, and carried the same duty as, imitation stones. The Tariff Act of 1913 retained both the language and the rate of duty of the Tariff Act of 1909 with respect to imitation precious stones and synthetic stones, but increased the rate of duty from 10 to 20 per centum on genuine precious stones.  In the Tariff Act of 1922, the rate for both precious stones and imitation precious stones remained the same, to wit, 20 per centum, but the words "artificial, or so-called synthetic or reconstructed," which appeared in the Tariff Acts of 1909 and 1913, were omitted from the Tariff Act of 1922.

When the Tariff Act of 1909 was being formulated, importers of precious stones appeared before the Committee on Ways and Means, House of Representatives, and submitted a brief outlining suggested changes.  In the record of the Tariff Hearings before the Committee on Ways and Means, House of Representatives, Sixtieth Congress, 1908–1909, at page 6777, appears the following:

At the outset we wish to emphasize the point that we have separated all genuine stones from imitation stones or material.  The first group consists of genuine precious stones, pearls, corals, shell, ivory, porcelain, paintings, and mosaics, for which we ask a uniform duty of 10 per centum ad valorem, and the second group, of *imitations* of the above articles, *including* also scientific, *synthetic*, and reconstructed stones and doublets, for which we ask a uniform duty of 20 per centum ad valorem.  [Italics ours.]

At page 6781, it is stated:

Notwithstanding the fact that so-called reconstructed, scientific, and synthetic rubies and so-called reconstructed emeralds have after litigation been held dutiable as precious stones, the importers of these *artificial* stones unanimously voted to ask your committee that they be classified with *imitations* of precious stones in the future at 20 per centum ad valorem, instead of 10 per centum ad valorem which they pay at present.—(G. A., 6336, T. D. 27278; G. A., 6637, T. D. 28295.) [Italics ours.]

The above suggestion was adopted and synthetic stones were included in the provision for imitation precious stones in the Tariff Act of 1909 and made dutiable at the same rate as imitation precious stones, viz, 20 per centum ad valorem.

The predecessor paragraph 1429 of the Tariff Act of 1922, as passed by the House of Representatives, provided, among others, for "Chatons, doublets, and synthetic cut stones  *  *  *  20 per centum ad valorem; imitation pearls of all kinds and shapes  *  *  *,  and

imitation precious or semiprecious stones *except* chatons, doublets, and synthetic cut stones of any kind, of all kinds and shapes, of whatever material composed, 45 per centum ad valorem." [Italics ours.] At the Hearings before the Senate Finance Committees, 1921, 67th Congress, 2d Session, a representative of importers of imitation precious stones and pearls appeared relative to paragraph 1429 and submitted a brief therein. In the record of such hearings, Vol. V, page 4161, the following pertinent portions of such brief appear:

> The first part of paragraph 1429, which provides rates of duty on diamonds and other precious stones, uncut; pearls, not set or strung; diamonds and other precious and semiprecious stones, cut * * *, we concur in.

The attention of the committee was then called to the remaining portion of paragraph 1429 providing for "chatons, doublets, and synthetic cut stones," etc., and in that connection the following comment appears:

> This part of the paragraph, if enacted into law, will increase the present rate of 20 per cent ad valorem, which was also the rate provided for in the act of 1909, to 45 per cent ad valorem on nearly all of the imitation precious stones which are used by the manufacturing jewelers and the manufacturers of combs and celluloid novelties of New England and which are an absolutely essential raw material of that industry. While it is true that 20 per cent ad valorem is provided for "chatons, doublets, and *synthetic cut stones,*" we call attention to the fact that *such* are but an exceedingly small percentage of the *imitation* stones used by the American industry. * * *
> We ask that the rate of duty on imitation precious stones, cut or faceted, suitable for use in the manufacture of jewelry and *similar* articles, be fixed at 20 per cent ad valorem. These stones are not made in this country, never have been made here, and, in our judgment, can not possibly be made here. [Italics ours.]

Subsequently, the provision for "chatons, doublets, and synthetic cut stones" was stricken out of the proposed bill (Amendment 1243), the House receding when it was shown that "The Senate amendment struck out these duties and substituted a duty of 20%." The proposed substitute for paragraph 1429, which was recommended to the committee as a stone paragraph, was therefore enacted into law.

In the President's proclamation of December 16, 1947 (T. D. 51802), issued under the authority of section 350, Tariff Act of 1930, as amended, to carry out certain provisions of the trade agreement entered into between the United States and several foreign countries on October 30, 1947, the following appears under Schedule XX relative to that portion of paragraph 1528 of the Tariff Act of 1930 referring to imitation precious stones:

> 1528    Imitation precious stones, cut or faceted, imitation semiprecious stones, faceted, marcasites and imitation marcasites_____ 10% ad val.
> NOTE: Synthetic precious or semiprecious stones shall not be entitled to any reduction in duty by virtue of any provision of this Agreement.

It will again be observed that the reference to synthetic precious or semiprecious stones is listed under the heading calling for imitation precious or semiprecious stones. It would further appear from the foregoing that synthetic stones were dutiable with imitation precious or semiprecious stones but that, in reducing the duty on the imitation stones from 20 per centum to 10 per centum ad valorem and specifically exempting synthetic precious or semiprecious stones from the benefit of such reduction, it was the intent to have the synthetic stones remain dutiable at the higher rate of 20 per centum ad valorem to which imitation stones were subjected before the reduction.

The legislative history set forth above convinces us that Congress intended synthetic cut stones to be classified the same as "imitation precious stones, cut" at the rate of 20 per centum ad valorem. Congress, in enacting the Tariff Act of 1922, omitted from the portion of paragraph 1429 containing the provision for imitation stones the words *"artificial, or so-called synthetic or reconstructed"* [italics ours] which appeared in the predecessor paragraph [357] of the Tariff Act of 1913. The legislative history of that paragraph, however, indicates that as originally passed in the House it specifically provided for "chatons, doublets, and synthetic cut stones" at the rate of 20 per centum ad valorem and further provided for "imitation precious or semiprecious stones, *except* chatons, doublets, and synthetic cut stones" [italics ours] at the rate of 45 per centum ad valorem. Congress, in striking out the provision for "chatons, doublets, and synthetic cut stones" and in fixing a rate of duty at 20 per centum ad valorem, indicated an intention to include articles of that character within the provision for "imitation precious stones" and to apply a rate of 20 per centum ad valorem thereupon as requested by the importers of precious and imitation precious stones as indicated above (Amendment 1243). While the legislative history of paragraph 1528, Tariff Act of 1930, indicates that synthetic stones *differ* from the imitation stones in that they are of the same composition as the true gem, whereas imitation precious stones are glass imitations of the genuine stone, yet Congress has indicated that for tariff purposes the same rate of duty be applied to each.

Between 1913 and 1930 both precious stones, cut, and imitation precious stones, cut, were dutiable at 20 per centum ad valorem. It made no difference then whether synthetic or reconstructed stones were regarded as either precious or imitation precious stones. In the Tariff Act of 1922 the Congress adopted suggestions made at the legislative hearings to substitute a duty of 20 per centum ad valorem for all imitation precious stones, including synthetic stones. It was not suggested that the portion of the paragraph relating to precious

stones be changed so as to include within it synthetic stones. The rate as to precious stones was not changed. The Congress took no affirmative action to indicate that synthetic stones, heretofore classified at 20 per centum ad valorem, should take a lower rate. It would appear that the omission of the words "artificial, or so-called synthetic or reconstructed" from the Tariff Act of 1922 did not indicate an intent on the part of the Congress to have synthetic stones classified as precious stones.

On this record, we find these synthetic stones are not *eo nomine* provided for in the Tariff Act of 1930. It is also clear that while they resemble precious stones, they are not such. It is further apparent from the testimony that they are not known in the trade as imitation precious stones. We are convinced from the legislative history that Congress intended them to be dutiable at the same rate as imitation precious stones.

We therefore find the synthetic rubies and sapphires here before us to be dutiable under paragraph 1528, Tariff Act of 1930, at the rate of 20 per centum ad valorem as assessed. The protest is overruled and judgment will be entered accordingly.